**Raymond JENKINS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 06–CF–1455.**

District of Columbia Court of Appeals.

Argued Sept. 27, 2011.

Decided Sept. 12, 2013.

---

Lee R. Goebes, Public Defender Service, with whom James Klein and Alice Wang and Jessica Brand, were on the brief, for appellant.

Amanda Winchester, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino and Michael Ambrosino, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges.

OBERLY, Associate Judge:

Appellant Raymond Jenkins was convicted of first-degree murder while armed, first-degree burglary while armed, attempt to commit robbery while armed, two counts of first-degree felony murder while armed, and possession of a prohibited weapon, all in connection with the June 1999 stabbing death of Dennis Dolinger. In this appeal, appellant seeks reversal of his convictions on the ground that his rights under the Confrontation Clause of the Sixth Amendment were violated when the trial court permitted the government to present the entirety of its DNA evidence through the testimony of a single expert witness without making available for cross-examination the laboratory analysts who performed the underlying serological and DNA laboratory work.

While this case was pending on appeal, the Supreme Court of the United States decided *Williams v. Illinois,* —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). We asked the parties to brief the question of "what impact, if any, the plurality and concurring opinions in *Williams v. Illinois* should have on resolution of the Confrontation Clause issues raised in this case[.]" We now hold that the splintered decision in *Williams,* which failed to produce a common view shared by at least five Justices, creates no new rule of law that we can apply in this case. Accordingly, we apply pre-*Williams* case law—both the Supreme Court's and our own—and conclude that the testimony and reports of the government's expert witness, Dr. Frank Baechtel, were admitted in violation of the Confrontation Clause. We further conclude that the error was not harmless,

and we therefore reverse the judgment of the Superior Court and remand the case for a new trial.

In addition to his Confrontation Clause claim, appellant argues that the trial court abused its discretion when, denying a defense discovery motion, it declined to compel the government to determine and report the number of "pairwise matches, at 9 or more loci" in the FBI and Virginia State DNA databases. We affirm the denial of the defense's discovery motion.

## I. Background

Dennis Dolinger was murdered in the basement of his house on Potomac Avenue, S.E., on June 4, 1999.[1] He sustained twenty-five stab wounds to his head and neck and was already dead when emergency responders arrived. A Metropolitan Police Department ("MPD") Mobile Crime Unit technician, who arrived to collect evidence from the house, testified without objection that he "discovered patterns of blood throughout the house," including on a pair of jeans lying near Dolinger's body; on a bath towel and a sink stopper found in the basement bathroom (suggesting to police that "someone had gotten injured during the attack and attempted to wash their hands in the bathroom"); on a bannister or railing leading to the second floor of the house; and on a gray pullover shirt found in a dressing room on the second floor, in which there was a chest of drawers "that it appeared ... somebody had rambled through."[2] The technician collected blood samples from several locations in the house but agreed that he did not "take swabbings of all the blood ... observed in the house." The medical exam-

iner testified at trial that Dolinger's stab wounds were consistent with having been inflicted by a Phillips screwdriver.

Shortly after the murder, the MPD learned that a man identified as Stephen Watson had made several purchases using Dolinger's credit card. Police officers executed a search warrant at Watson's residence and recovered a black backpack (which Watson said he had found discarded near the King Street Metro station) and a wallet containing Dolinger's credit, identification, and bank cards. MPD officers initially arrested Watson for Dolinger's murder, but subsequent DNA testing excluded Watson as a suspect.

On November 16, 1999, the MPD received information that caused appellant to become a "person of interest." As we explained in an earlier opinion in this case reversing the trial court's pretrial order excluding the introduction of DNA evidence, *United States v. Jenkins*, 887 A.2d 1013 (D.C.2005):

> Seeking further assistance, on November 16, 1999, the government contacted the Virginia Department of Criminal Justice Services ("DCJS") requesting that DCJS run the profile of the unknown person [whose blood DNA was found in Dolinger's house] through Virginia's DNA database of 101,905 previously profiled offenders. Using only eight of the thirteen loci profiled by the FBI, the DCJS reported that the evidence sample was consistent with the eight-loci profile of Robert P. Garrett, a known alias of [appellant] Raymond Anthony Jenkins. At that point, the MPD investigation focused solely on Mr. Jenkins.

---

1. At various places in the trial transcript, "Dolinger" is spelled "Dolenger." For consistency, when quoting from the transcript, we have used the first spelling, without noting the variation.

2. In that same room, police found open jewelry boxes. They later discovered that some of Dolinger's jewelry, including a diamond ring, was missing.

*Id.* at 1017 (footnote omitted). As part of its investigation, the MPD obtained a search warrant to take a sample of appellant's blood, and it submitted the sample to the FBI for analysis. After a first round of testing, the FBI took another sample of appellant's blood to develop a "full 13 loci profile" and compared it to the DNA profiles that the FBI had developed from the unknown-source blood found at the crime scene.

At trial,[3] Dr. Frank Baechtel, a forensic examiner and head of one of the FBI's DNA analysis laboratories, testified that the 13–loci DNA profile developed from appellant's blood sample matched at all loci the 13–loci DNA profiles that the laboratory had developed (before appellant became a suspect).[4] Dr. Baechtel testified, and his reports indicated, that he found a match between appellant's DNA and the DNA extracted from blood taken from the back of the gray shirt, from inside the pockets of the jeans discovered near Dolinger's body, from the towel and sink (a sink stopper and a swabbing of the sink itself) in the basement bathroom, and from the bannister swabbing. He testified that the likelihood of a merely coincidental match was at least 1 in 26 quadrillion in the African–American population, 1 in 870 quintillion in the Caucasian population, and 1 in 1,000 quintillion in the Southeastern Hispanic population. He further testified that Dolinger's blood also was found on the gray shirt. In conclusion, Dr. Baechtel testified that "the profiles of [appellant] or Dennis Dolinger account for all of the profiles in the blood evidence." The court did not give the jury an instruction limiting in any way the use of Dr. Baechtel's testimony or reports.

The government also called several other witnesses at trial. James West, who worked at The Fireplace, a bar frequented by appellant, testified that appellant usually wore a grayish-blue pullover shirt and blue jeans. West identified the gray shirt recovered from Dolinger's dressing room as "just like" the shirt that appellant usually wore. Anthony Scott, who knew appellant because they both "hung out" in the Dupont Circle area, also identified the gray shirt as one that appellant "wore all the time" (explaining that appellant "used to wash it in the little fountain" in Dupont Circle).[5] Scott further identified the black backpack found during the search of Watson's home as the backpack that appellant typically carried and testified that appellant "always" kept a Phillips screwdriver inside.[6] Scott also testified that on June 5, 1999, the day after Dolinger's murder, he saw appellant in Dupont Circle and observed that he (appellant) was "all scratched up" on his face, hands, and arm (causing Scott to ask, "Man, were you in a cat fight or something?") and had "little cuts" and "bruises in his hand" as if he had "gripped something real tight." Appellant was carrying over $1,000 in cash, a dia-

---

3. Appellant was originally tried in March 2006, but that trial ended in a hung jury on all counts. Appellant's second trial, resulting in the convictions that he now appeals, commenced in June 2006. The government's evidence at appellant's first trial did not differ materially from its evidence at his second trial.

4. The government did not rely on the cold hit at trial. The jury did not learn that the unknown DNA profile derived from crime-scene evidence was run through Virginia's DNA database of previously identified offenders.

5. Both Scott and West also testified to having seen appellant leave The Fireplace with Dolinger.

6. MPD Detective Oliver Garvey testified that police had not made public that the weapon used in the killing of Dolinger was a screwdriver.

mond ring, and a "bunch of little gold chains."

Robert Bethea, who, like Scott, knew appellant from frequenting the Dupont Circle area, testified that in early June 1999, he saw appellant on the Metro. Appellant told Bethea that "he was going over to a" "white dude['s]" house "to steal stuff" and would just "fuck him up" if he didn't want to let appellant in. A few days later, Bethea again ran into appellant, who had "several pieces" of jewelry that he was trying to sell, including a diamond ring. Still later, when Bethea once again encountered appellant in Dupont Circle, appellant told Bethea that he had been in a fight with a guy, that he had "fucked him up . . . [and] punished him," and that he did not know if the man was "dead or alive."

William Martin, a self-styled "jailhouse lawyer," testified that while he and appellant were incarcerated together in February 2000, appellant asked him "if he could be convicted of dried blood." When Martin told appellant, "yeah," appellant appeared "shocked." On a later occasion, Martin testified, appellant told Martin that he had "robbed a faggot" and had stabbed the "white guy" with a screwdriver and taken "a thousand dollars and some cash and a ring." Martin said appellant told him that, after the robbery, he left his backpack near the Potomac Avenue Metro station and that he was aware that another "white guy" had found the backpack and had used the credit cards. Appellant stated that he was going to allow the "white guy" to take the charge because that guy "was dying of AIDS anyway."

Appellant did not testify at trial, but the defense advanced the theory that the "attack was directed at Dennis Dolinger because Mr. Dolinger was inside that house with Raymond Jenkins and they're inside that house and they are engaging inside that house in some act of some degree of sexual activity and someone came in and didn't like what the person saw"; and that "[t]hat person reacted, responded, attacked and in the attack Raymond Jenkins got cut and . . . got out of there." Defense counsel told the jury that the "police investigation in this case missed evidence left and right" and emphasized that there were "several blood stains [in Dolinger's house] that simply just went untested." [7] In addition, he emphasized that evidence technicians did not swab the wearer areas of the jeans found next to Dolinger's body (which defense counsel posited belonged to the real killer) and that DNA extracted from the wearer areas of the gray shirt provided "definitive evidence of someone else['s] connection to the sweatshirt."

## II. Appellant's Confrontation Clause Claim

Appellant's defense team filed a pretrial motion to preclude the government from presenting the results of the FBI's DNA testing without the in-court testimony of the personnel who actually did the laboratory work. The trial court denied the motion, ruling that if the laboratory personnel were "available to be subpoenaed and to be called as witnesses by the defense, then . . . that address[ed] the confrontation issue." [8] As a result, the

---

7. Defense counsel also highlighted to the jury that government witnesses Martin, Scott, and Bethea were all felons who sought parole help, letters of support, or other favorable treatment from the United States Attorney's Office.

8. The court issued its ruling on March 10, 2006, prior to this court's December 2006 decision in *Thomas v. United States*, 914 A.2d 1, 7, 15, 22 (D.C.2006) (rejecting the argument that the Confrontation Clause is satisfied through a defendant's ability to "subpoena[ ] the [Drug Enforcement Administration] chemist" and to "question[ ] her as upon

government presented its DNA evidence solely through the testimony of Dr. Baechtel and the reports that he prepared, which were admitted into evidence. Appellant contends that the trial court's "decision to permit the United States to introduce the entirety of its DNA evidence through the testimony of Baechtel alone violated [appellant's] rights under the Confrontation Clause" and amounted to reversible error.

■ We start by recognizing that the Sixth Amendment right of an accused to confront the witnesses against him is a fundamental right.[9] *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Were we unwilling to adhere to this view of the Confrontation Clause in all cases, even those that might require us to overturn a first-degree murder conviction, then "the guarantee of confrontation [would be] no guarantee at all." *Giles v. California,* 554 U.S. 353, 375, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008).

In this jurisdiction, it is settled that "[f]orensic evidence, including DNA analysis, is not exempt from *Crawford's* [10] holding" that the Confrontation Clause of the Sixth Amendment bars the admission of testimonial hearsay against a criminal defendant at trial, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine him. *Young v. United States,* 63 A.3d 1033, 1039 (D.C.2013); *see also Gardner v. United States,* 999 A.2d 55, 59 (D.C.2010); *Roberts v. United States,* 916 A.2d 922

(D.C.2007). "Permitting the defendant to cross-examine a surrogate expert who did not personally perform or observe the forensic analysis at issue is not a constitutionally permissible substitute for cross-examination of the scientist who actually did the testing." *Young,* 63 A.3d at 1039.

Since the Supreme Court decided *Crawford,* Confrontation Clause cases involving forensic evidence have turned on the meaning of "testimonial." *Id.* In *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354, the Supreme Court identified " '[v]arious formulations' " of the " 'core class of testimonial statements,' " but the Court "declined 'to spell out a comprehensive definition of testimonial' suitable for all cases." *Thomas v. United States,* 914 A.2d 1, 12 (D.C. 2006) (quoting *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354). This court has recognized that, at a minimum, "to be testimonial, a statement must have been made, primarily, for an evidentiary purpose." *Young,* 63 A.3d at 1040. The Justices of the Supreme Court do not agree, however, on whether a statement must meet any additional criteria in order to be considered testimonial. In this case, we decide whether the Court's decision in *Williams* affects our rule in *Roberts,* 916 A.2d at 938, that there is no "dispute that the conclusions of FBI laboratory scientists—the serologist, the PCR/STR technician, and the examiner—admitted as substantive evidence at trial are 'testimonial' under *Crawford.*"

cross-examination as a hostile witness"), and prior to the Supreme Court's opinion in *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 307, 324, 329, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (holding that "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits" and that "the ability to subpoena the analysts ... is no substitute for the right of confrontation").

9. The Confrontation Clause declares that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI.

10. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

## A. Governing Law

### 1. Confrontation Clause Jurisprudence Before *Williams*

The Supreme Court first took up the issue of whether reports of laboratory analysts' findings are "testimonial" for Confrontation Clause purposes in *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). In that case, the trial court had "admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." *Id.* at 307, 129 S.Ct. 2527. In a 5–4 decision, the Supreme Court held that "[t]here is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements'" that the Court had described in *Crawford*. *Id.* at 310, 129 S.Ct. 2527 (quoting *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). The documents at issue in *Melendez–Diaz* were "quite plainly affidavits" because they were "'solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact.'" *Id.* (quoting *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). Moreover, the Court held, "not only were the affidavits made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, but under Massachusetts law the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id.* at 311, 129 S.Ct. 2527 (citations and internal quotation marks omitted). Thus, the Court could "safely assume that the analysts were aware of the affidavits' evidentiary purpose." *Id.*

Writing separately in *Melendez–Diaz*, Justice Thomas, the fifth member of the majority, stated that he joined the Court's opinion "because the documents at issue in this case are quite plainly affidavits, ... [and][a]s such, they fall within the core class of testimonial statements governed by the Confrontation Clause." *Id.* at 330, 129 S.Ct. 2527 (Thomas, J., concurring) (citation and internal quotation marks omitted). Justice Thomas stated that he "continue[d] to adhere to [his] position [which he expressed in *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) ] that the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Melendez–Diaz*, 557 U.S. at 329, 129 S.Ct. 2527 (Thomas, J., concurring) (internal quotation marks omitted).

The Supreme Court returned to the issue of the Confrontation Clause and forensic laboratory reports in *Bullcoming v. New Mexico*, — U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). Petitioner Bullcoming was arrested on charges of driving while intoxicated, and the principal evidence against him at trial was a forensic laboratory report that was unsworn, unlike the report at issue in *Melendez–Diaz*, but that certified that Bullcoming's blood-alcohol concentration exceeded the threshold for the charged offense. *Bullcoming*, 131 S.Ct. at 2709. The State "did not call as a witness the analyst who signed the certification"; instead, it called another analyst who was familiar with the laboratory's testing procedures but had not participated in or observed the test performed on Bullcoming's blood sample. *Id.* The issue before the Court was "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test report-

ed in the certification." *Id.* at 2710. In another 5–4 decision, the Court held that Bullcoming's "right [was] to be confronted with the analyst who made the certification[.]" *Id.* Relying on *Melendez–Diaz,* the Court held that "[a] document created solely for an evidentiary purpose ... made in aid of a police investigation, ranks as testimonial." *Id.* at 2717. In addition, the Court held, the report of blood alcohol analysis, although it was unsworn, could not be distinguished from the sworn certificates at issue in *Melendez–Diaz. Id.* (explaining that "the formalities attending the 'report of blood alcohol analysis' [were] more than adequate to qualify [the analyst's] assertions as testimonial").

Justice Sotomayor wrote separately to highlight her view that the laboratory report was testimonial "specifically because its primary purpose is evidentiary." *Id.* at 2719 (Sotomayor, J., concurring) (internal quotation marks omitted); *see also id.* at 2721 n. 3 (opining that "[f]ormality is not the sole indicator of the testimonial nature of a statement because it is too easily evaded"). She also "emphasize[d] the limited reach of the Court's opinion," for it did not resolve the issue that might be presented in some other "substitute" witness scenarios, where "the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue," rather than someone who "played no role in producing the ... report." *Id.* at 2719, 2722 (Sotomayor, J., concurring).

Although Justice Thomas joined most of the opinion in *Bullcoming,* he did not join footnote 6, which states that "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *Id.* at 2714 (Thomas, J., concurring) (quoting *Davis v.*

*Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

This court's relevant Confrontation Clause jurisprudence starts with *Thomas,* 914 A.2d 1, decided before *Melendez–Diaz* and *Bullcoming.* In *Thomas,* we applied *Crawford's* "various formulations" of what constitutes a testimonial statement, and we agreed with appellant Thomas that the trial court's admission in evidence of a Drug Enforcement Administration chemist's certified report in the absence of live testimony from the chemist who wrote it violated Thomas's "right ... to be confronted with the witnesses against him." *Thomas,* 914 A.2d at 16. The DEA chemist's report satisfied every formulation of "testimonial" articulated by the Supreme Court in *Crawford:* (1) the DEA chemist "was tasked by the government to provide critical expert witness testimony for use against appellant at his criminal trial," and therefore it was a " 'statement[ ] that [was] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' " *id.* at 12–13 (quoting *Crawford,* 541 U.S. at 52, 124 S.Ct. 1354); and (2) "[i]n form and content, the report was a formal and solemn 'attestation'—an affidavit, except that it was unsworn—introduced by the prosecution in lieu of the chemist's live testimony." *Id.* at 13. In that case, it was "difficult to imagine a statement more clearly testimonial." *Id.* at 13.

Following *Thomas,* we decided a series of cases involving Confrontation Clause claims that focused on the testimony of DNA experts who referred to forensic laboratory findings, but who did not themselves perform the underlying laboratory tests. The first of these cases was *Roberts.* The DNA expert who testified at appellant Roberts's trial on sexual abuse charges had not performed the serology

testing, the DNA extraction from biological material, or even the original analysis of the DNA; rather, he had reviewed the original DNA analyst's report as part of a "technical review," going through it "as if it was his ... own case," coming to "his own conclusions," and then "comparing them to the first examiner's interpretation." *Id.* at 937–38 (alterations omitted). He "testif[ied] in the place of" the original DNA examiner. *Id.* at 937. The DNA expert's opinion testimony, and in particular his "opinion that appellant could not be excluded as a contributor to the DNA evidence[,] rested on the conclusions reached by the team that did the actual laboratory analysis." *Id.* at 938. We held that "*Thomas* leaves no room for dispute that the conclusions of FBI laboratory scientists—the serologist, the PCR/STR technician, and the examiner—admitted as substantive evidence at trial are 'testimonial' under *Crawford.*" *Id.* In so holding, we reasoned:

> [T]he FBI laboratory scientists here were "forensic expert[s] employed by a law enforcement agency, ... tasked by the government" to perform tests providing the basis for "critical expert witness testimony ... against appellant at his criminal trial." ... To the extent that their conclusions were used as substantive evidence against appellant at trial, he was therefore entitled to be "confronted with" the conclusions in the manner the Sixth Amendment requires, that is, through the opportunity for cross-examination of the declarant.

*Id.* (quoting *Thomas,* 914 A.2d at 13).[11] We drew no conclusions about the formality of the laboratory reports at issue in that case.

In *Gardner,* the government had been permitted to introduce into evidence the testimony of Dr. Robin Cotton, a representative of a private forensic laboratory that had conducted the DNA testing and analysis, and the testimony of Caroline Zervos, an FBI serology analyst. 999 A.2d at 57. "Dr. Cotton did not perform the DNA testing herself and she did not supervise the analyst who performed the testing" but performed a " 'technical review' of the case file and lab[oratory] report after [they were] mailed to her." *Id.* at 59. Zervos likewise "did not conduct or supervise testing," but was the " 'technical reviewer' of the results and final report." *Id.* The government did not present the testimony of any of the scientists or analysts who conducted the serology testing at the private laboratory or at the FBI. *Id.* at 57. At trial, both testifying experts "read directly from the reports of the analysts who conducted the tests." *Id.* at 59, 61, 62 n. 12.

The government "concede[d] that the conclusions set forth in the DNA and serology reports were 'testimonial' " and that "the admission of these results, either through the admission of the DNA report or the expert testimony, violated appellant's rights under the Confrontation Clause ... because the scientists who actually conducted the testing were not available for cross-examination." *Id.* at 58–59, 59 n. 5. Citing *Melendez–Diaz* and *Roberts,* we agreed in a footnote that "there is no question that this evidence was testimonial" because the government's DNA and serology analysis was " 'created primarily for the government to use it as a substi-

---

11. In *Veney v. United States,* 936 A.2d 811 (D.C.2007), an opinion issued shortly after *Roberts,* we "[a]ssum[ed] a confrontation clause violation" where, although the testifying DNA expert was a "supervisory analyst" of a "three-person DNA Team" and "used her own interpretations of the DNA evidence," she "made references to the serology tests and the data produced by operation of a DNA-typing instrument, both carried out by other scientists on the team that she managed[.]" *Id.* at 831.

tute for live testimony in a criminal prosecution.'" *Id.* at 59 n. 4 (quoting *Thomas,* 914 A.2d at 13–14). As in *Roberts,* the formality or solemnity of the laboratory reports from which the testifying experts read was not a factor in our conclusion that they contained testimonial hearsay. Concluding that the confrontation violation was not harmless beyond a reasonable doubt because "the DNA evidence was the cornerstone of the government's case," we reversed Gardner's conviction. *Id.* at 62.

Although the Supreme Court has not agreed on the limitations of what it means to be testimonial, our own case law has established the principle that statements of DNA findings and analysis are testimonial if they are made primarily with an evidentiary purpose, regardless of their formality or any other particular criteria.[12]

## 2. The Effect of *Williams* on Confrontation Clause Jurisprudence

The Supreme Court's most recent Confrontation Clause case has not provided any clarity. *Williams* was decided by a plurality opinion and Justice Thomas's opinion concurring in the judgment. During petitioner Williams's bench trial for rape, the prosecutor called as its expert a forensic specialist at the Illinois State Po-

lice ("ISP") laboratory, who testified that according to ISP business records, vaginal swabs taken from the victim were sent to Cellmark, an outside, accredited laboratory, and were returned to the State police laboratory "along with a deduced male DNA profile." *Williams,* 132 S.Ct. at 2227, 2230. The expert testified that based on her comparison of the Cellmark-developed DNA profile found in semen from the vaginal swabs and the DNA profile that had been developed by the ISP laboratory from a sample of Williams's blood taken when he was arrested on unrelated charges, Williams "cannot be excluded as a possible source of the semen identified in the vaginal swabs." *Id.* at 2230. Williams argued that "the expert went astray when she referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs." *Id.* at 2227. The Court noted that "[t]he expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample[,]" and she did not "vouch for the accuracy of the profile that Cellmark produced." *Id.*

In the portion of its opinion relevant here,[13] the *Williams* plurality held that

---

**12.** The dissent finds our summary of the holding in *Roberts* "somewhat misleading," noting that in that case we held that the evidence was testimonial because the lab analysts performed tests that "provid[ed] the basis for 'critical expert witness testimony ... against appellant at his criminal trial.'" *Roberts,* 916 A.2d at 938 (quoting *Thomas,* 914 A.2d at 13). *Post* at 206. The dissent emphasizes the language "against appellant at his criminal trial," but we do not read that language to mean that appellant must have been accused at the time testing was completed. Indeed, in *Gardner,* we cited no requirement that the appellant have been accused at the time of testing in agreeing with the government's concession that the evidence was testimonial because the

DNA and serology reports were created primarily for use at a later criminal prosecution. 999 A.2d at 59 n. 4.

**13.** As described above, the trial court in the instant case did not give the jury an instruction limiting in any way the use of Dr. Baechtel's testimony or reports; thus, they were admitted as substantive evidence. Accordingly, the primary rationale supporting the plurality holding in *Williams* does not apply: That, because the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted, a DNA expert's testimony that relayed the findings of outside laboratory analysts but that was admitted for the limited

"even if the report produced by Cellmark had been admitted [as substantive] evidence, there would have been no Confrontation Clause violation." *Id.* at 2228. The plurality listed several reasons for its conclusion: "The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach"; "[t]he report was produced before any suspect was identified[ ]" and "was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose"; and the profile that Cellmark provided "was not inherently inculpatory." *Id.*

The plurality noted that all except one of the post-*Crawford* cases in which the Court found a Confrontation Clause violation "shared the following two characteristics": The cases "involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct" and "they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id.* at 2242.[14] The Cellmark report, the plurality reasoned, was "very different[,]" since "[i]t plainly was not prepared for the primary purpose of accusing a targeted individual[ ]" or "to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time," but instead was prepared "to catch a dangerous rapist who was still at large." *Id.*

In his opinion concurring in the judgment, Justice Thomas agreed that the Cellmark report was not testimonial— "solely because Cellmark's statements lacked the requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause"—but he rejected the plurality's "targeted accusation" test because it "lacks any grounding in constitutional text, in history, or in logic." *Id.* at 2255, 2262 (Thomas, J., concurring). The requirement that a statement is testimonial only if it is meant to incriminate a known individual "makes little sense." *Id.* at 2263. "A statement that is not facially inculpatory may turn out to be highly probative of a defendant's guilt when considered with other evidence." *Id.* Justice Thomas "agree[d] that, for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution[,]" but for Justice Thomas, "this necessary criterion is not sufficient, for it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity...." *Id.* at 2261.

According to Justice Kagan's dissenting opinion, joined by Justices Scalia, Ginsburg, and Sotomayor, the Court's "Confrontation Clause precedents" made *Williams* "an open-and-shut case." *Williams*, 132 S.Ct. at 2265 (Kagan, J., dissenting). The Cellmark report was testimonial because it "was made to establish some fact in a criminal proceeding" and it "detail[ed] the results of forensic testing

purpose of explaining the basis for the expert's opinion rather than for the truth of the laboratory analysts' findings, did not violate Williams's confrontation rights. *Williams*, 132 S.Ct. at 2240.

14. The exception, the plurality observed, is *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct.

2266, 165 L.Ed.2d 224 (2006), in which the statement at issue was "elicited in the course of police interrogation" and "had the primary purpose of accusing a targeted individual," but lacked formality. *Williams*, 132 S.Ct. at 2243.

on evidence gathered by the police." *Id.* at 2266–67. "[W]hen the State elected to introduce the substance of Cellmark's report into evidence, the analyst who generated that report became a witness whom Williams had the right to confront." *Id.* at 2266–68 (internal quotation marks omitted). Justice Kagan rejected the plurality's targeted accusation test as having "no basis in our precedents," which have previously focused on "whether a statement was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence." *Id.* at 2273 (quoting *Davis,* 547 U.S. at 822, 126 S.Ct. 2266, and citing *Bullcoming, Bryant, Melendez–Diaz,* and *Crawford* ).[15] Apart from its lack of grounding in precedent, the dissent was not persuaded by any of the plurality's reasons for adopting the targeted accusation test. For one thing, "the typical problem with laboratory analyses—and the typical focus of cross-examination—has to do with careless or incompetent work, rather than with personal vendettas. And as to that predominant concern, it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect." *Id.* at 2274.

Concluding, Justice Kagan commented on the confusion that *Williams* would leave in its wake:

> Before today's decision, a prosecutor wishing to admit the results of forensic testing had to produce the technician responsible for the analysis. That was the result of not one, but two decisions this Court issued in the last three years. But that clear rule is clear no longer. . . . What comes out of four Justices' desire to limit *Melendez–Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.

*Id.* at 2277.

This jurisdiction has decided one case since *Williams.* In *Young,* 63 A.3d at 1036, the appellant, Young, was identified as a suspect in a sexual assault case through a "cold hit" when the DNA profile of the assailant derived from the complainant's vaginal swabs matched Young's profile in the FBI's database of offender DNA profiles. The police eventually obtained a

---

**15.** *See Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) (recognizing that "the basic objective of the Confrontation Clause ... is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial"); *Davis,* 547 U.S. at 822, 126 S.Ct. 2266 (holding that statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"); *Crawford,* 541 U.S. at 52, 124 S.Ct. 1354 (testimonial statements include "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"); *Melendez–Diaz,* 557 U.S. at 310–11, 129 S.Ct. 2527 (same, quoting *Crawford,* 541 U.S. at 52, 124 S.Ct. 1354). In fact, the accusatory purpose rationale was rejected in *Melendez–Diaz,* 557 U.S. at 313, 129 S.Ct. 2527 (rejecting the argument that "the analysts are not subject to confrontation because they are not 'accusatory' witnesses, in that they do not directly accuse petitioner of wrongdoing"). "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Id.* at 319, 129 S.Ct. 2527. In rejecting the accusatory purpose argument, the Court reasoned: "Like expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination." *Id.* at 320, 129 S.Ct. 2527.

buccal tissue sample from Young and the DNA profile derived from that sample matched the derived profile of the assailant. *Id.* This DNA evidence was presented through the testimony of Rhonda Craig, an FBI examiner "who had compared and matched the DNA profiles generated from the buccal sample and the crime scene evidence," but who had not herself performed the testing or computer analysis that generated the profiles. *Id.* at 1037.

In determining what effect the fractured *Williams* opinion had on Young's appeal, we recognized that the so-called *Marks* principle—that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds," *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks omitted)—did not apply, "for the two opinions of the Justices who concurred in the judgment in *Williams* lack the necessary common denominator." *Young,* 63 A.3d at 1043. As we explained:

> A statement could be made for the purpose of accusing a targeted individual and therefore be testimonial under Justice Alito's test without being formal enough to satisfy Justice Thomas's test. Conversely, a statement could be sufficiently formal to pass Justice Thomas's test without being accusatory or targeted at a particular person. Thus, the rationales of Justice Alito's opinion and Justice Thomas's opinion are incommensurable—neither rationale is subsumed within the other or narrower than the other in any meaningful sense that we discern.

*Id.; see also Williams,* 132 S.Ct. at 2265 (Kagan, J., dissenting) ("I call Justice Alito's opinion 'the plurality,' because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication.").

For the resolution of Young's appeal, we found it unnecessary to determine any precise holding in *Williams,* extracting instead "an intermediate position":

> By analogy to *Marks,* it can be argued that while Justice Alito's rationale and Justice Thomas's rationale may not be includible *within each other,* the different tests they utilize to determine whether a statement is testimonial are subsumed within and narrower than *the dissenters' test.* That is so because Justice Alito and Justice Thomas each added an additional requirement to the basic "evidentiary purpose" test espoused by Justice Kagan. If the four-Justice plurality would deem a statement testimonial under the targeted accusation test, the four dissenting Justices surely would deem it testimonial under the broader evidentiary purpose test. Similarly, if Justice Thomas would deem a statement testimonial employing his formality criterion along with the evidentiary purpose test, the four dissenting Justices necessarily would deem it testimonial using the evidentiary purpose test alone. It therefore is logically coherent and faithful to the Justices' expressed views to understand *Williams* as establishing—at a minimum—a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus *either* the plurality's targeted accusation requirement or Justice Thomas's formality criterion.

63 A.3d at 1043–44. Applying this sufficient criterion to Young's appeal, we concluded that the hearsay that Craig relayed

was testimonial "[u]nder the basic 'evidentiary purpose' test" because "the DNA profiles and [random match probabilities] about which Craig testified were generated for the primary purpose of establishing or proving a past fact relevant to later criminal prosecution, namely the identity of [the complainant's] assailant." *Id.* at 1048. We held that Craig's testimony also satisfied Justice Alito's targeted accusation test because the DNA results from Young's buccal sample, which were central to Craig's testimony, were obtained after Young had been identified as a suspect by the cold hit. *Id.* Craig's testimony was thus admitted in violation of the Confrontation Clause.

*Young's* sufficient criterion takes us only so far in this case. Much of the forensic evidence that Dr. Baechtel relayed through his written reports and testimony was obtained after appellant became a suspect [16] and thus because it passes both the basic evidentiary purpose test and the plurality's additional targeted accusation test, we can conclude that a majority of the Justices would agree this evidence was testimonial. Other forensic evidence that the government relied upon, however, although it would pass the evidentiary purpose test, would not be considered testimonial under either the plurality opinion or Justice Thomas's concurrence, such that we cannot say whether a majority of the Justices would agree this evidence was testimonial. Some of the testing was done before appellant became a suspect—the initial testing of crime scene evidence that produced the "mystery profile" of a single individual—and thus was not done with the purpose of targeting appellant. In addition, the DNA results, on which Dr. Baechtel's written reports and testimony were based, did not have the formality or solemnity of an affidavit, as Justice Thomas would require.

*Young* established a sufficient criterion for determining when evidence is testimonial, using a kind of reverse-*Marks* approach based on the plurality opinion and Justice Thomas's opinion each resting on a narrower definition of testimonial than the dissenting opinion. We were careful in *Young* not to make the sufficient criterion extracted from *Williams* a necessary one; in other words, this court left open the possibility that a statement might be considered testimonial even if it does not meet the sufficient criterion. We decline to extend *Young* to hold that for a statement to be considered testimonial it *must* pass the basic evidentiary purpose test plus either the plurality's targeted accusation requirement or Justice Thomas's formality criterion. Because the evidence at issue here lacked Justice Thomas's required formality and involved both pre- and post-target testing, we must determine what effect, if any, *Williams* has on the outcome of this case.

We are presented here with the question of how to treat a fractured Supreme Court opinion when *Marks* does not apply. As we observed in *Young*, *Marks* "works only when the narrowest opinion actually does represent 'a common denominator.'" *Young*, 63 A.3d at 1043 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir.1991)). Where there is no common denominator in the Court's reasoning, "no particular standard constitutes the law of the land, because no single approach can be said to have the support of a majority of the Court." *Rappa v. New Castle County*, 18 F.3d 1043, 1058 (3d Cir.1994). In such cases, the Court's opinions "do not establish a governing standard for future cases." *Id.* at 1060. "If applied in situa-

---

16. When appellant became a suspect after the cold hit, the FBI took two samples of appellant's blood and conducted additional rounds of testing on crime scene evidence.

tions where the various opinions supporting the judgment are mutually exclusive, *Marks* will turn a single opinion that lacks majority support into national law," which "surely cannot be proper." *King*, 950 F.2d at 782. "[I]f the application of *Marks* will not yield a majority holding, nothing will." [17] *Id.* at 784. We therefore conclude that *Williams* produces no new rule of law that we can apply in this case.[18]

At least one court has held that *Williams* is "confined to the particular set of facts presented in that case." *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013). In doing so, the Second Circuit "conclude[d] that we must rely on Supreme Court precedent before *Williams* to the effect that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial." *Id.* We do the same here, relying on pre-*Williams* precedent in the Supreme Court and in our own jurisdiction to determine whether the government's expert witness, Dr. Baechtel, relayed testimonial hearsay in violation of appellant's rights under the Confrontation Clause.

### B. Admission of Dr. Baechtel's Reports and Testimony

Dr. Baechtel testified that his responsibilities as a forensic examiner are to "man-

---

**17.** Although "it would be possible to predict the outcome in almost every case simply by counting the votes of the Justices," as the dissent urges in this case, "such a system would be unprincipled" because it would combine the accusatory purpose test and the formality test to conclude that certain evidence is nontestimonial "even though not one Justice would have argued that there was any special synergistic effect of the two attributes." *Rappa*, 18 F.3d at 1060 n. 24. "[G]iving precedential value to a matrix predicting results would produce a system of low level, fairly predictable, formal rules but a system not rooted in any consistent constitutional values." *Id.* More importantly, particularly as it applies to this case, "the predictability of such a system is lower than it appears, because the Supreme Court is likely to reconsider any case which produces a splintered result." *Id.* This case is the very type whose outcome could not be fairly predicted by counting the votes in *Williams*. Unlike the situation in *Williams*, where the prosecution relied exclusively on a cold hit before appellant became a suspect, the prosecution in this case did not rely on the cold hit that identified appellant as a suspect; it relied on a comparison of appellant's DNA profile derived from his blood sample after he became a suspect and the "mystery profile" developed from the crime scene evidence before he became a suspect. Although most of the crime scene evidence was collected, tested, and analyzed before appellant became a suspect, Dr. Baechtel's testimony that appellant's DNA matched the DNA profile found at the crime scene was based on the additional rounds of testing completed after appellant became a suspect. This is similar to *Young*, in which we recognized that the government did not rely on the cold hit that identified Young as a suspect—although the DNA profile of the complainant's attacker, derived from her vaginal swabs, was created before Young became a suspect—and instead the expert testified that she "had compared a DNA profile of Young created by her staff from his buccal swab with a male DNA profile derived at the lab from [the complainant's] vaginal swabs." *Young*, 63 A.3d at 1038 & n. 10. In addition, although appellant was not a suspect at the time the FBI conducted its first round of testing, a suspect in the case did exist: Stephen Watson had been arrested and charged with the crime. The DNA testing exonerated Watson, but the fact that he was a suspect at the time of testing weakens the argument that the primary purpose of the testing "was to catch a dangerous [killer] who was still at large," not to obtain evidence for use against a suspect in custody. *Williams*, 132 S.Ct. at 2243.

**18.** Although we conclude that *Williams* gives us no new governing standard, we would be bound by its result in a "substantially identical" case. *See Rappa*, 18 F.3d at 1061. However, for the reasons set out in footnote 17, we do not think this case is "substantially identical" to *Williams* such that we are bound by its result.

age the examination of forensic evidence" in his FBI DNA Analysis Unit and to "mak[e] sure that everything [is] done correctly." He explained that he does not perform the tests on the biological material himself but, rather, is "assisted by [b]iologists or technicians who actually perform the hands-on part of the testing" or "DNA typing" in the laboratory. In connection with this case, Dr. Baechtel explained, he worked with a team of technicians, with whom he "interacted during the examinations";[19] their role was "to perform the actual chemical test on the evidence items." He further explained that the technician writes up a "description about each item ... describing what she sees, what size the stain is and ... what portion of the stain she's taken [for] analysis." He testified that "after the items have been dealt with on [s]erology, ... appropriate samples from those items are sent to the DNA side of the house," where a "[b]iologist or [b]iologists perform the actual hands-on testing for DNA typing"— "[i]n other words, the recovery of DNA from whatever the stains are [and] its amplification...." The biologists then "print out the data" and "it gets turned over to [Dr. Baechtel] for decision," i.e., for Dr. Baechtel's assessment about whether a DNA profile developed from a crime scene sample is consistent with the known DNA profile of an individual.[20]

By referring to the findings of other laboratory analysts—those who tested for the presence of biological material in the crime scene evidence and those who extracted and amplified the DNA—and doing so without a limiting instruction that would have directed the jury not to consider the analysts' findings as substantive evidence, we think it is clear that under the law in this jurisdiction Dr. Baechtel relayed hearsay.[21] He testified that blood was found on various items sent to the FBI laboratory for analysis, thus conveying to the jury information he presumably

19. Dr. Baechtel did not explain what he meant by "interacting," testifying at one point that he "might have" personally looked at a shirt that was found underneath Dolinger's body, but he could not remember.

20. Dr. Baechtel also explained that after the technicians "go through the procedures to recover DNA from a stain[,] we have to determine how much we have.... There is a lower limit below which we can't depict DNA and under those circumstances I would say no detectable DNA."

21. We recognize that Justice Sotomayor's concurrence in Bullcoming left open the question whether expert testimony like Dr. Baechtel's would be admissible as substantive evidence without the in-court testimony of the analysts if "the person testifying" is someone with "a personal, albeit limited, connection to the scientific test at issue," for example, "a supervisor who observed an analyst conducting a test." Bullcoming, 131 S.Ct. at 2722 (Sotomayor, J., concurring). This case, however, is governed by our decisions in Young and Veney v. United States, 936 A.2d 809, 811 (D.C.2007). Like the expert in Young, Dr. Baechtel supervised a team of serologists and biologists who performed the actual testing and relied on the testing and analyses of those other scientists. See Young, 63 A.3d at 1037; see also Veney, 936 A.2d at 811 (agreeing that admission of expert testimony from supervisor who "made references to the serology tests and the data produced by operation of a DNA-typing instrument, both carried out by other scientists on the team she managed," violated the Confrontation Clause). Also like the expert in Young, the extent to which Dr. Baechtel's supervision involved any personal connection to the tests and analyses he reviewed is unclear on the record before us and we will not attempt to discern what he meant by "interacting." Young, 63 A.3d at 1038–39 n. 12 (declining to "indulge th[e] supposition [that the expert personally observed the DNA testing] in the evidentiary vacuum before us" because "[t]he government, as the proponent of [the expert's] testimony, had the burden of establishing the basis for its admissibility when appellant objected to it"). We therefore conclude that Dr. Baechtel relayed hearsay.

knew only from serology reports. For example, he testified that "stain[s] taken from inside the pocket" of the jeans found near Dolinger's body were "confirmed to be blood." He also explained to the jury that "B" markings on evidence that had been submitted to the laboratory for analysis meant that "blood [ ] was identified there." As to the DNA technicians' findings, Dr. Baechtel circled, on a government demonstrative exhibit, evidence from which there were "no DNA types detected" or from which "insufficient DNA [was] obtained," thus relaying the DNA technicians' findings. He testified that "[t]he profile for [appellant, developed from his blood sample,] was the same as the [unknown-individual DNA obtained from the crime-scene items]." When asked by the prosecutor to consider "all the blood evidence in this case where you were able to develop DNA profiles," Dr. Baechtel agreed that "the profiles of [appellant] or Dennis Dolinger account for all of the profiles in the blood evidence[.]"

Further, the government offered and the court admitted into evidence Dr. Baechtel's written DNA reports, which contained statements (such as "Blood," "No blood," "Insufficient DNA obtained," and "Jenkins as major contributor; Dolinger as minor") that were based on the laboratory analysts' findings. The reports indicate, inter alia, that a "DNA Profile Match" to appellant was found between the DNA profile developed from appellant's blood sample and the DNA profile developed from the gray shirt, the jeans, the towel, the sink and stopper, and the bannister.

■ Under pre-Williams case law in this jurisdiction, the hearsay that Dr. Baechtel relayed also was testimonial. The serology and DNA testing was conducted for the primary purpose of establishing some fact relevant to a later criminal prosecution: the identity of Dolinger's killer. As in Thomas and Roberts, "the FBI laboratory scientists here were 'forensic expert[s] employed by a law enforcement agency, . . . tasked by the government' to perform tests providing the basis for 'critical expert witness testimony . . . against appellant at his criminal trial.'" Roberts, 916 A.2d at 938 (quoting Thomas, 914 A.2d at 13). Because the tests were conducted "expressly for use in criminal prosecutions as a substitute for live testimony against the accused," the stated results of those tests are testimonial. Thomas, 914 A.2d at 14. Thus, Dr. Baechtel's testimony, relaying the lab findings, was admitted in violation of appellant's rights under the Confrontation Clause.

The dissent asserts that we apply the Confrontation Clause with "wooden formalism" and that such an application is uncalled for in this case because the crime-scene evidence "was made available for testing or re-testing by appellant's defense team." Post at 207–08. We rejected this very argument in Thomas, explaining that "[t]he flaw in the logic of this argument is evident: if the chemist was available to the defense, then she also was available to the prosecution, i.e., she was not unavailable to testify in person as Crawford categorically requires. Crawford's unqualified insistence on the declarant's unavailability as a precondition to admitting testimonial hearsay forecloses the argument that there exists an 'available to the accused' exemption from the demands of the Confrontation Clause." Thomas, 914 A.2d at 15. Perhaps more fundamentally, as we noted in Thomas, "an 'available to the accused' exemption would be contrary . . . to the plain language of the Sixth Amendment," which "imposes a burden of production on

the prosecution, not on the defense."[22] *Id.* at 16.

### C. Harmless Error

■ Having found a Confrontation Clause error, we must reverse appellant's conviction unless we find the error harmless beyond a reasonable doubt. *Young,* 63 A.3d at 1049; *Gardner,* 999 A.2d at 58. "Under [this] heightened constitutional standard of review, the government bears the burden of demonstrating that . . . the verdict was surely unattributable to the erroneously admitted evidence." *Kaliku v. United States,* 994 A.2d 765, 775 (D.C. 2010) (internal quotation marks omitted); *see also Brooks v. United States,* 39 A.3d 873, 889 (D.C.2012).

■ The government argues that any confrontation error in this case was harmless beyond a reasonable doubt because "appellant openly conceded at trial that both his blood and DNA were found at the crime scene . . . to advance the theory that [he] was really a second victim who was attacked by some unknown perpetrator." Because it is true that appellant's counsel conceded in both opening and closing statements that appellant's blood was found in all the locations in Dolinger's house where the government sought (through Dr. Baechtel's testimony) to prove it was found, this case bears certain similarities to *Kaliku.* In that case, we assumed without deciding that there had been a Confrontation Clause error but concluded that the error was harmless beyond a reasonable doubt because "[f]rom opening to closing statements [the defendants] conceded that they engaged in sexual acts with [the victim,] . . . maintain[ing] that those sexual acts were consensual." 994 A.2d at 776. "The references to consensual sex during [the defendants'] opening and closing arguments were tantamount to, or indeed constituted, evidentiary admissions," and thus were binding upon the party.[23] *Id.* at 777.

Appellant's evidentiary admission, however, does not account for the other blood and DNA testimony in issue: Dr. Baechtel's testimony that Dolinger's blood, too, was found on the gray shirt (evidence that the prosecutor used to argue that "there is only one way that this blood here got . . . onto [d]efendant's shirt, he placed Dennis Dolinger in a headlock"); his testimony that appellant's and Dolinger's DNA profiles "account for all of the profiles in the blood evidence" (evidence that the prosecutor used to argue that "[t]here's no evidence of two people with cuts walking around that house." There is "only evidence . . . that one person is cut badly inside."); and his testimony that insuffi-

---

22. Anticipating what it calls a "knee-jerk reaction," the dissent quotes Justice Kennedy's dissent in *Melendez–Diaz* that "requiring the [government] to call the technician who filled out a form and recorded the results of a test is a hollow formality." *Post* at 208 (quoting *Bullcoming,* 131 S.Ct. at 2724 (Kennedy, J. dissenting)). In the dissent's view, there is no reason to question the reliability of Dr. Baechtel's testimony, and we ought to apply a test that "sensibly avoids reversal of a murder conviction." *Post* at 208. Of course, the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford,* 541 U.S. at 61, 124 S.Ct. 1354. It is the absence of this constitutional procedural requirement—one designed to protect a fundamental right of the accused to confront witnesses against him—that is of critical importance in this case.

23. We therefore agree with the dissent that the admission of evidence that appellant's blood was found in various places at the crime scene was harmless beyond a reasonable doubt because appellant conceded that his blood was found where Dr. Baechtel said it was found. *Post* at 201.

cient DNA was found on several pieces of crime scene evidence.[24]

Appellant's evidentiary admission that his own blood was found on the crime scene was neither an admission that his was the only blood there other than Dolinger's, nor an admission that Dolinger's blood was found where Dr. Baechtel indicated, and we do not believe the admission of this evidence was harmless beyond a reasonable doubt. Indeed, it undermined, perhaps fatally, the defense theory that appellant was a second victim rather than the killer.

■ The non-DNA evidence against appellant was not weak, but we cannot say it was so strong that the verdict was "surely unattributable" to the admission of Dr. Baechtel's forensic testimony and reports. The three witnesses whose testimony was most incriminating—Scott, Bethea, and Martin[25]—also had serious credibility problems. Moreover, we think it significant that appellant's first jury, hearing materially similar evidence, could not agree on any of the charges against him. See Brooks, 39 A.3d at 889 (hung jury at first trial relevant to harmless error review). We do not believe the additional circumstantial evidence "suffice[s] to overcome the presumption of harm flowing from the constitutional error," Fields v. United States, 952 A.2d 859, 867 (D.C. 2008), especially in light of the fact that "we cannot underestimate the weight that juries give to forensic evidence, particularly DNA evidence," Gardner, 999 A.2d at 63.[26]

### III. Appellant's Rule 16 Claim

We now turn to appellant's claim that the trial court abused its discretion when it denied appellant's motion, filed pursuant to Super. Ct. Crim. R. 16(a)(1)(C) and 16(a)(1)(D), to compel the government to determine and report all the current pairwise matches at 9 or more loci in the National DNA Index System (NDIS) and the Virginia State DNA Index System (SDIS), excluding any duplicate profiles and marking any profiles belonging to siblings.[27] The defense filed this motion on February 9, 2006, approximately a month before the first trial began. It argued that

24. Because this testimony was based on lab findings and analysis completed before appellant became a suspect, the dissent would deem this evidence nontestimonial and thus properly admitted under the Confrontation Clause. Post at 201. For the reasons previously discussed, we do not agree.

25. Two of them claimed that appellant had confessed to them, and the third identified the recovered backpack as the one appellant typically carried with a screwdriver inside and claimed to have seen appellant the day after the murder looking as if he had been in a fight.

26. We cannot agree with the dissent's alternative rationale for affirming appellant's conviction—that appellant waived his confrontation rights by strategically using Dr. Baechtel's inadmissible testimony to bolster his defense. See E.L. Cheeney Co. v. Gates, 346 F.2d 197, 206 (5th Cir.1965) ("[T]his testimony was elicited after the Court, over vigorous objection, had admitted the general reputation testimony from the highway patrolman. Counsel were simply trying to make the best of a situation brought about by the Court's ruling."). Although a defendant may waive an objection to the admission or use of improper evidence when he introduces such evidence himself, there is a fundamental difference between independently introducing improper evidence or making an argument that relies on improper evidence, on the one hand, and, on the other hand, responding to the government's affirmative case by cross-examining a witness the defense had tried to exclude from testifying.

27. The Combined DNA Index System (CODIS) is a software database program that maintains the national database (NDIS) and that states use to compile their records into indexed databases.

the government's case "rest[s] almost entirely on the reliability of the DNA report that suggests that Mr. Jenkins is the only person to possess a DNA profile like that found" at the crime scene, "based on the government's contention that the random match probability (RMP) for the profile shared by Mr. Jenkins and the crime scene evidence is in the order of 1 in 26 quintillion." Defense counsel told the court that he anticipated that a report on the number of pairwise matches at 9 or more loci would demonstrate "a great deal of coincidence ... among the profiles in the databases" and would "substantially undermine the government's contention that Mr. Jenkins is the source of the crime scene DNA." He further argued that the anticipated results would show that "coincidental matches are far more frequent than the [government's RMP] statistics imply."

As an example to support its argument, the defense pointed to the results of a discovery request involving the 65,000–profile Arizona DNA database, which revealed that "1 in every 228 profiles in that state's ... system matches another profile at 9 or more loci" and "1 in [every] 32,747" profiles matches another profile at 12 loci. Appellant's counsel expected that "a similar frequency [will be] found" in the Virginia and NDIS databases. Counsel argued "empirical evidence of coincidental DNA

matches at 9 or more loci" might make the government's expert "unwilling to testify that Mr. Jenkins is the unique source of the crime scene DNA" and the requested information would thus be necessary to conduct an adequate cross-examination. Moreover, counsel argued, the Arizona discovery response "took just a few hours to prepare."

In opposing the defense motion to compel, the government argued that the discovery request was irrelevant, untimely, and infeasible. The government emphasized that this case involved a 13–loci match and that no research had ever revealed a coincidental match between two 13–loci DNA profiles.[28] The government also argued that the research the defense requested "could take years and would shut down or significantly hamper one of the federal government's most effective law enforcement tools." The government submitted an affidavit from Thomas Callaghan, Chief of the FBI CODIS Unit, who asserted that the FBI had never done a pairwise comparison like the one the defense requested, and who estimated that an initial search, on "over 2.9 million offender DNA profiles," would take "a minimum of 120 to 180 days to complete." Callaghan stated in addition that "[b]ecause the overwhelming majority of the

28. Appellant did not dispute that matches at 13 loci would be more rare than matches at lower numbers of loci. Cf. United States v. Davis, 602 F.Supp.2d 658, 676 (D.Md.2009) ("[O]ne is obviously more likely to find a coincidental match at seven or eight loci than at twelve or thirteen."). We note, too, that, during the Frye [v. United States, 293 F. 1013 (D.C.Cir.1923) ] hearing in this case, the trial court heard government expert Dr. Frederick Bieber testify that he was not aware of a single instance in which any scientist had identified two people sharing the same DNA profile at 13 loci, excluding identical twins. The attachment to appellant's motion to compel indicates that the 11– and 12–loci matches found in the Arizona database that appellant cited as the basis for his motion were between confirmed siblings, and that " '[r]elatedness' between 9 and 10 locus matches has not been determined." People v. Wright, 2012 IL App (1st) 073106, 361 Ill.Dec. 447, 971 N.E.2d 549, 577 (2012); cf. State v. Dwyer, 985 A.2d 469, 474–76 (Me.2009) (reasoning that a search of Maine's convicted felon DNA database to find matches at 9 or more loci was "not reliable due to the known existence of twins, other relatives and duplicate samples already entered into the database").

convicted offender records do not contain personally identifiable information sufficient to ascertain duplicate or sibling profiles," he was unable to estimate the additional time that would be required to identify duplicates and siblings.

At the initial hearing on the motion to compel, the trial court stated:

[L]ooking at this declaration [of] Mr. Callaghan regarding the time that it would take to produce the information, relevance aside for the moment, it looks like he's saying a minimum of ... four to six months. So if that's what he's saying, that is a problem [and] ... I think that there is a substantial timeliness issue and I'm prepared to deny the request on [a] timeliness basis....

The court deferred its ruling on the motion, however, until a few days later. In ruling on the motion on February 22, 2006, the court agreed that the requested information was "relevant," and commented that it did not understand "why the FBI [could not] run ... or retrieve the information," but ultimately declined to compel the FBI to do so since "for whatever reason they're claiming they can't."

Appellant now argues that the court abused its discretion in denying the motion because the FBI did not assert that it could not comply with the request, because the time-consuming nature of the requested search was "not a valid legal basis to deny an otherwise proper discovery request under Rule 16," and because the court ruled without hearing live testimony on the issues (despite appellant's request, made after the court had ruled, that the court "bring Dr. Callaghan in" to testify).

Rule 16(a)(1)(C) provides that:

Upon request of the defendant the prosecutor shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense, or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Rule 16(a)(1)(D) provides that:

Upon request of a defendant the prosecutor shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the prosecutor, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

We review a trial court's Rule 16 discovery ruling for abuse of discretion. *Young,* 63 A.3d at 1051; *United States v. Curtis,* 755 A.2d 1011, 1014 (D.C.2000). However, "[t]he correct interpretation and application of Rule 16 ... is a legal question [that] we review *de novo* since judicial discretion must ... be founded upon correct legal principles." *Ferguson v. United States,* 866 A.2d 54, 59 (D.C.2005) (internal quotation marks omitted). "[W]here the defendant is entitled to discovery, and the trial court denies it ..., we determine whether the nondisclosure was prejudicial." *Id.* (internal quotation marks omitted).

Although the trial court ruled that the number of pairwise matches at 9 or more loci would be relevant and material to the preparation of appellant's defense, this case is governed by our recent holding in *Young* that the results of an NDIS

search would not be material to the appellant's defense. Like appellant here, the appellant in *Young* sought a list of all DNA profiles in the NDIS database that matched at 9 or more loci. We held that "where appellant requested discovery in order to impeach the FBI's statistical analysis of the rarity of his DNA profile, he needed to make 'some preliminary showing of a reason to doubt the [statistical] analysis provided by the government.'" *Young*, 63 A.3d at 1051 (quoting *Curtis*, 755 A.2d at 1015). This he did not do. Because the studies on "the foundations of the formula for calculating [random match probabilities]" are inconclusive, we "s[aw] no reason to disagree with" a review of studies concluding that "'the research to date gives little reason to doubt the adequacy of the existing model for computing' random match probabilities." *Id.* at 1056 (quoting David H. Kaye, *Trawling DNA Databases for Partial Matches: What is the FBI Afraid Of?*, 19 CORNELL J.L. & PUB. POL'Y 145, 164 (2009)). We further noted that even if "data from a NDIS search might demonstrate that RMPs as currently calculated could be more accurate, that does not mean the difference would be material in this or any other case" because the "[error range] would have to be very substantial indeed to have a material effect on such an extremely low RMP as that calculated in this case (less than one in 2.8 quintillion)." *Id.* Although "[r]eputable scientists and scholars have argued that it would be desirable as a matter of policy and scientific accuracy to investigate the frequency of matches in very large data-

bases such as NDIS" to study the accuracy of RMP calculations, for now we treat as adequate the government's statistical analysis. *Id.* at 1055

■ Even if appellant could show that the pairwise comparison search would be material to his defense, the trial court did not abuse its discretion in denying the discovery request as untimely. Discovery in the case had been ongoing for years, the motion to compel was argued when the long-scheduled trial was a few weeks away, and the trial court had before it Callaghan's undisputed sworn statement that completing the requested search would take at least three months and probably more.[29] And, although the defense argued that its February 2006 motion was based on "recently discovered information" about the frequency of matches in the Arizona database, the record shows that the defense was aware of at least some of the Arizona information as early as April 2005. The transcript of a hearing held on April 4, 2005, shows that appellant's counsel told the court that "in Arizona they observed . . . unrelated people" who were not "linked genetically in any way" sharing loci in a database. The untimeliness of appellant's motion to compel was an adequate basis for denial of the motion. *See Young*, 63 A.3d at 1057 (upholding trial court's ruling that defendant's pairwise comparison motion filed one month before trial was untimely because the search would take several months and the motion could have been filed earlier).[30]

---

29. Appellant did not present any contrary affidavits or sworn testimony challenging the statistics upon which the FBI relied. The fact that Callaghan's affidavit was undisputed justified the court in ruling without hearing live testimony.

30. Contrary to appellant's argument that the time required for compliance with the request and similar considerations were not a valid

legal basis for the court's ruling, we have held that a Rule 16 discovery request must be "reasonable, that is, it may not unduly burden the government." *Beaner v. United States*, 845 A.2d 525, 536 (D.C.2004) (internal quotation marks omitted); *Curtis*, 755 A.2d at 1016 ("This court has recognized that the request for discovery materials must be reasonable

## IV.   Conclusion

Although we affirm the denial of appellant's discovery request, he is entitled to relief on his Confrontation Clause claim. We therefore reverse his convictions and remand for a new trial.[31]

*Reversed and remanded.*

Dissenting opinion by Associate Judge THOMPSON.

THOMPSON, Associate Judge, dissenting:

My colleagues in the majority conclude that appellant Jenkins is entitled to reversal of his first-degree murder and other convictions on the ground that the admission of DNA testimony by an expert who relayed the underlying laboratory analysts' findings without the laboratory analysts having been called to testify violated appellant's rights under the Sixth Amendment Confrontation Clause, and constituted reversible error. On the facts of this case, I cannot agree. Neither Supreme Court jurisprudence nor our own case law requires the result my colleagues reach, and, in my view, reversal of appellant's conviction is wholly unwarranted.

As I explain below, there are compelling reasons why we should hold instead that admission of the DNA expert's testimony was not error with respect to some of the laboratory findings, and was not reversible error with respect to other laboratory findings the expert relayed. In the alternative, even if we assume that the DNA expert's testimony was admitted in violation of the Confrontation Clause and might otherwise constitute reversible error, we

and may not unduly burden the government.").

**31.** Because we reverse appellant's convictions, we need not address his argument that his armed first-degree burglary and attempted

should hold that appellant waived his confrontation rights when he relied on (and urged the jury to rely on) the DNA expert's testimony about the laboratory analysts' findings to his own advantage.

### I.

**A.   This court should hold that admission of the DNA expert's testimony and the laboratory reports either was not error at all or was not reversible error.**

The Confrontation Clause "bars the government from introducing testimonial statements at trial against a criminal defendant without calling the declarant to testify in person, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *Thomas v. United States,* 914 A.2d 1, 11 (D.C.2006) (citing *Crawford v. Washington,* 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Thus, whether admission of the statements contained in a laboratory analyst's report without live testimony by the analyst implicates the Confrontation Clause "turns ... on whether the report was 'testimonial.'" *Id.* at 12.

*1.   It is clear that five Justices of the Supreme Court would hold that the critical forensic evidence in this case was not testimonial.*

In *Crawford,* the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68, 124 S.Ct. 1354. As this court recognized in *Young v. United States,* 63 A.3d 1033 (D.C.2013), nearly a decade later, the Supreme Court remains

armed robbery convictions must merge with the felony murder convictions predicated on those crimes, and that the felony murder convictions then must merge with his first-degree murder conviction.

divided on what criteria an out-of-court statement must meet in order to be deemed "testimonial," and thus to implicate a defendant's rights under the Sixth Amendment Confrontation Clause. *Id.* at 1040. Indeed, with particular regard to out-of-court statements by forensic laboratory analysts, the Supreme Court's jurisprudence has left us with "persistent ambiguities in the Court's approach." [1]

Nevertheless, one fact can be clearly distilled from the Court's opinions in this area: Five Justices of the Supreme Court would agree that DNA testimony by an expert who did not perform or witness the underlying laboratory work is *not* testimonial hearsay where the underlying laboratory report lacks the formality of an affidavit *and* where the laboratory findings were made before the defendant became a suspect (such that it cannot be said that the primary purpose of the laboratory analysis was to obtain evidence for use against the defendant at his criminal trial). *See Williams v. Illinois,* — U.S. —, 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89 (2012) (plurality opinion) (concluding that admission of testimony about an underlying laboratory report through a DNA expert did not violate the Confrontation Clause violation because the report "is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach" and because the report "was produced before any suspect was identified" and "was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a [criminal] who was on the loose"); *id.* at 2259, 2261 (Thomas, J., concurring in the judgment) (agreeing with the plurality that "for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution," but opining that "this necessary criterion is not sufficient, for it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity" and that "the Confrontation Clause regulates only the use of statements bearing 'indicia of solemnity.' ").[2]

The fact that five Justices of the Supreme Court ("the five Justices") agree

---

1. *Bullcoming v. New Mexico,* — U.S. —, 131 S.Ct. 2705, 2726, 180 L.Ed.2d 610 (2011) (Kennedy, J., dissenting); *see also Williams v. Illinois,* — U.S. —, 132 S.Ct. 2221, 2248, 183 L.Ed.2d 89 (2012) (Breyer, J., concurring) (observing that none of the Court's decisions provides a "general answer" to or "fully deals with the underlying question as to how, after *Crawford,* Confrontation Clause 'testimonial statement' requirements apply to crime laboratory reports").

2. *See also id.* at 2250–51 (Breyer, J., concurring) ("As the plurality notes, in every post-*Crawford* case in which the Court has found a Confrontation Clause violation, the statement at issue had the primary purpose of accusing a targeted individual."); *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 329, 330, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (Thomas, J., concurring) (joining the Court's 5–4 opinion that certificates of forensic analysis were testimonial "because the documents at issue in this case are quite plainly affidavits, … [and] [a]s such, they fall within the core class of testimonial statements governed by the Confrontation Clause," and explaining that he "continue[d] to adhere to [his] position [which he expressed in *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)] that the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[]") (citation and internal quotation marks omitted). The consistency described in the statements quoted in this footnote answers my colleagues' suggestion that how the five Justices would rule on the issue presented in this case cannot "be fairly predicted." *Ante,* 189 n. 17.

that laboratory-analyst reports that were not formalized and that were made before the defendant became a suspect are not testimonial is of critical importance in this case.[3] None of the evidence at issue here (i.e., the laboratory findings that DNA expert Dr. Baechtel relayed) was in the form of an affidavit, attestation, certification, sworn statement, or similar formal declaration; thus, the analysts' reports lacked the formality that Justice Thomas has repeatedly opined is necessary for a statement to be testimonial. In addition, what turned out to be the most important forensic evidence in the government's case—the evidence that enabled Dr. Baechtel to conclude that victim Dolinger's blood was found on the front, upper right of the gray shirt that other trial witnesses linked to appellant,[4] and the evidence that blood DNA of only a single unknown individual (acknowledged by the defense to be appellant Jenkins) was found on the lower right back of the gray shirt, in the left pocket of the jeans that were lying near Dolinger's body, on the basement sink and sink stopper, and on the bannister leading to the second floor of Dolinger's house—was the result of laboratory work (including serology work and DNA extraction and typing) done before appellant was identified as a suspect.[5]

Given that five Justices of the Supreme Court would agree that the forensic laboratory evidence described above was *not* testimonial hearsay as relayed by Dr. Baechtel, we should hold that this evidence was properly admitted, without the individuals who did the underlying laboratory work having been called to testify.[6] *See State v. Deadwiller*, 834 N.W.2d 362, 378–79 (Wisc.2013) (concluding that testimony did not violate defendant's right to confrontation because, "[a]pplying the various rationales of *Williams*, a majority of the United States Supreme Court would come to the ... conclusion ... that the expert's testimony did not violate the defendant's right to confrontation[ ]"); *People v. Dungo*, 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442, 456 (2012) ("[W]e must determine whether there was a confrontation clause violation under Justice Thomas's opinion *and* whether there was a confrontation clause violation under the plurality's opinion. If there was no violation under both opinions, then the result (finding no confrontation clause violation) would command the support of a majority from the high court's *Williams* case."); *Gutierrez v. Yates*, No. CV 11–3123 MWF (FFM), 2012 WL 5348698, at *8, *8 2012 U.S. Dist. LEXIS 157092, at *22, *23 (C.D.Cal. Sept. 10, 2012) (habeas proceeding concluding

3. *Cf. United States v. Williams*, 435 F.3d 1148, 1153 (9th Cir.2006) ("We need not find a legal opinion which a majority joined, but merely a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.") (internal quotation marks omitted).

4. This was evidence that the prosecutor emphasized to argue that "there is only one way that this blood ... got ... onto [d]efendant's shirt[:] he placed Dennis Dolinger in a headlock."

5. My colleagues retort that the FBI's first round of testing was conducted after Stephen Watson had been arrested and charged with

the crime. *Ante*, 189 n. 17. That is of no moment, because, it seems to me, the whole point of the targeted accusation test is to require confrontation of declarants who have a motive to tailor their statements to support the accusation against the suspect. In this case, the laboratory work actually exonerated the then-suspect Watson, and, because appellant did not become a target of the police investigation until months later, there is no basis for suspicion that the first round of laboratory work was tailored to implicate him either.

6. In subsection c *infra*, I meet my colleagues' other objections to this analysis.

that state appellate court "reasonably applied Supreme Court precedent" in holding that laboratory analyst's statements were not testimonial, because when analyst "Haynes prepared his file, petitioner was not a suspect in the case" and Haynes's file was not "a formalized document akin to an affidavit or sworn declaration"), *adopted by* No. CV 11–3123 MWF (FFM), 2012 WL 5347953, 2012 U.S. Dist. LEXIS 155587 (C.D.Cal. Oct. 29, 2012); *cf. State v. Medina,* 306 P.3d 48, 63 (Ariz.2013) (holding that where an "autopsy was conducted the day after the murder, before Medina became a suspect" and the autopsy report did not " 'certify[ ] the truth of the analyst's representations,' " the report was non-testimonial).[7]

### 2. Admission of the forensic evidence that we are bound to recognize as testimonial was harmless beyond a reasonable doubt.

There was, to be sure, additional laboratory work done after appellant became a suspect. This court's opinion in *Young* requires us to treat this evidence as testimonial even though it lacked the formality that Justice Thomas generally would require for evidence to be deemed testimonial. *See Young,* 63 A.3d at 1043–44 ("[A] statement is testimonial at least when it passes the basic evidentiary purpose test plus *either* the [*Williams* ] plurality's targeted accusation requirement *or* Justice Thomas's formality criterion.") (emphasis in original). Admission of this testimonial hearsay evidence was not, however, reversible error.

Most of the evidence just described was DNA typing and other laboratory work involving appellant's known blood sample, on which Dr. Baechtel relied to conclude that there was a match between appellant's blood and the blood found at the crime scene. To repeat, in relaying the results of the underlying laboratory-analyst work, Dr. Baechtel relayed what *Young* compels us to hold was testimonial hearsay. Admission of this testimonial hearsay was not prejudicial, however, because appellant's trial counsel conceded in both opening statement and closing argument that appellant's blood was found in all the locations in Dolinger's house where the government sought (through Dr. Baechtel's testimony) to prove it was found.[8] Consistent with our holding in *Kaliku v.*

---

**7.** *Cf. also United States v. Shanton,* 513 Fed. Appx. 265, 267 (4th Cir.2013) (deciding case on the rationale that "[i]f this case were to go before the Supreme Court again, we believe five justices would affirm: Justice Thomas on the ground that the statements at issue were not testimonial and Justice Alito, along with the three justices who joined his plurality opinion, on the ground that the statements were not admitted for the truth of the matter asserted[ ]").

**8.** In his opening statement, defense counsel told the jury that "no one disputes that both Mr. Jenkins'[s] blood and Mr. Dolinger's blood were in that home." During closing arguments, defense counsel made similar statements, including, "[n]o one ever said that Raymond Jenkins'[s] blood wouldn't be found in the house, you all knew that going in. [Y]ou know why Mr. Jenkins was in that

house and you also know that his DNA, his blood, was only in four places in that house … the bathroom, the jeans, the back of the sweatshirt and one drop … that may have been on the railing. . . ." Defense counsel similarly acknowledged that the "blood on the wall sort of beneath where the steps … were … belongs to Raymond Jenkins[.]"

In light of appellant's concessions, my colleagues are wrong to suggest, *ante* at 189 n. 17, that the facts of this case are on all fours with those in *Young.* In *Young,* the expert testified that she "had compared a DNA profile of Young created by her staff from his [known, "post-targeting"] buccal swab with [an unknown] male DNA profile derived at the lab from [the complainant's] vaginal swabs" and determined that there was a match. 63 A.3d at 1038, 1038 n. 10. Young did not concede that the DNA on the complainant's vaginal swabs was his, and this

*United States,* 994 A.2d 765 (D.C.2010), we should conclude that counsel's concessions were evidentiary admissions that rendered admission of this evidence without presentation of the laboratory analysts who actually performed the underlying laboratory tests and procedures harmless beyond a reasonable doubt. *See id.* at 776–77.

The record shows that Dr. Baechtel also relayed other laboratory findings made after appellant became a suspect: that no blood was found on what other evidence showed was appellant's black backpack that contained Dolinger's credit and identification cards; that Dolinger's blood was found on the clothing removed from his body; that no DNA was found on the kitchen stool or bathroom floor of Dolinger's house; and that the DNA of five other individuals known to the FBI did not match DNA found at the crime scene. However, this evidence was either non-inculpatory, or cumulative of laboratory findings produced before appellant became a suspect in the case,[9] or both. Thus, its admission, too, was harmless beyond a reasonable doubt.[10]

To summarize the discussion above, the forensic laboratory evidence relayed by Dr. Baechtel in this case falls into three categories: (1) laboratory findings reported before appellant became a suspect, which should be deemed non-testimonial under the tests applied by the four Justices in the *Williams* plurality and Justice Thomas; (2) laboratory findings reported after appellant became a suspect, which we must recognize as testimonial hearsay under *Young,* but whose admission was harmless because appellant made evidentiary admissions acknowledging what the evidence showed (i.e., that his blood was found at the crime scene everywhere Dr. Baechtel said it was found); and (3) laboratory findings reported after appellant became a suspect, which we recognize as testimonial under *Young,* but whose admission was harmless because the evidence was non-inculpatory, cumulative of non-testimonial evidence, or both. Accordingly, none of this admitted evidence warrants reversal of appellant's conviction.

*3.  Neither Marks nor adherence to other pre-Williams Supreme Court precedent dictates against applying the guidance derived from the opinions of the plurality and Justice Thomas in Williams.*

My colleagues in the majority reject the analysis I set out above with respect to the

court concluded that his Confrontation Clause rights were violated, implicitly recognizing that, through cross-examination of the staff, he might have been able to expose laboratory lapses or falsehoods that led to an erroneous conclusion that there was a match. Here, by contrast, appellant conceded that his blood was on the gray shirt and everywhere else Dr. Baechtel said it was, rendering useless any cross-examination about laboratory analyst missteps with respect to appellant's blood DNA.

9. Specifically, the evidence was cumulative of the laboratory findings, reported before appellant became a suspect, that the only blood found on the crime-scene evidence belonged either to Dolinger or to a single unknown

individual (who, the defense conceded at the outset of trial, was appellant).

10. My colleagues in the majority imply that erroneously admitted DNA and other forensic laboratory evidence generally cannot be harmless. *Ante* at 193, quoting *Gardner v. United States,* 999 A.2d 55, 63 (D.C.2010) ("[W]e cannot underestimate the weight that juries give to forensic evidence, particularly DNA evidence."). However, it is noteworthy in this case that the jury in appellant's first trial, having heard the very same forensic evidence that was presented at · his second trial, was unable to reach a verdict. That fact alone belies any suggestion that the forensic evidence that was erroneously admitted in this case was so weighty as to require reversal.

laboratory findings produced before appellant became a suspect in the case, asserting that *Williams* was not precedential and "creates no new rule of law that we can apply in this case." *Ante,* 176, 189. They rely on "the so-called *Marks* principle—that '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds' " (quoting *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)) (internal quotation marks omitted), and then repeat the observation in *Young* that the plurality opinion in *Williams* and Justice Thomas's opinion concurring in the judgment "lack the . . . common denominator" necessary to eke out a precedential holding from the two opinions. *Young,* 63 A.3d at 1043.[11] My colleagues assert that we therefore "must rely on Supreme Court precedent before *Williams* to the effect that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial," *ante,* 189 (quoting *United States v. James,* 712 F.3d 79, 95–96 (2d Cir.2013)), and on pre-*Williams* case law in this jurisdiction, authorities that they reason compel the conclusion, as to all of the evidence discussed in subsections a and b above, that Dr. Baechtel relayed testimonial hearsay. *Ante,* 191–92.

I believe my colleagues' approach is misguided and that their objections need not and should not lead us to ignore the guidance of the five Justices. First, this court has never held that the fact that a plurality opinion and concurring-in-the-judgment opinion do not rely on a single rationale to explain the result (i.e., the fact that the *Marks* principle does not apply) means that guidance that may be derived from the opinions taken together is irrelevant. To the contrary, faced with this circumstance in the past, we have deemed it appropriate to analyze a case "under both [the concurring] opinion and the plurality's test." *Edwards v. United States,* 923 A.2d 840, 848 (D.C.2007) ("Since there is some disagreement concerning the precise analysis that *Seibert* [i.e., *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion with Justice Kennedy concurring in the judgment)] mandates, . . . we will analyze this case under both Justice Kennedy's opinion and the plurality's test."). Possibly, the plurality and concurring-in-the-judgment opinions in *Williams* will not be helpful in resolving in some other cases the issue of whether laboratory reports were testimonial, but I can think of no reason why we should want to ignore (or should feel free to ignore) the guidance we have received through these opinions when, together, they address the very situation that confronts us in this case with respect to the informal laboratory reports produced before appellant became a suspect.

Nor, in my view, in light of *M.A.P. v. Ryan,*[12] should we feel free to take a step backwards from our opinion in *Young,* where we recognized that the disparate *Williams* opinions make it appropriate to

---

11. *But see Derr v. State,* 434 Md. 88, 73 A.3d 254 (2013) ("The common point of agreement between the plurality opinion and Justice Thomas's concurring opinion is that statements must, at least, be formalized, or have 'indicia of solemnity' to be testimonial. Therefore, using the *Marks* approach, we conclude that the narrowest holding of *Williams* is that a statement, at a minimum, must be formalized to be testimonial.").

12. 285 A.2d 310, 312 (D.C.1971) (establishing the rule that no division of this court will overrule a prior decision of this court).

apply an "intermediate" test that endorses application of a rule that would evoke the agreement of a majority of the Justices. *See Young,* 63 A.3d at 1043–44.[13] Moreover, by refusing to take from the *Williams* opinions guidance that is directly applicable to this case, on the ground that the opinions do not establish "precedent," my colleagues have taken an unduly rigid approach.

Further, if my colleagues seriously mean to take guidance from "Supreme Court precedent before *Williams* " and to cleave to the *Marks* principle, to be consistent they ought not apply the rule they articulate, i.e., "that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial." *Ante,* 189 (quoting *James,* 712 F.3d at 96). That is because, *outside the context of a statement made in response to police interrogation,* a majority of the Supreme Court has never held that a sufficient criterion for deeming an out-of-court statement to be testimonial is that it was made with the primary purpose of creating a record for use at a later criminal trial. In *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), a majority of the court held that a statement "made in the course of police interrogation" is "testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 S.Ct. 2266. However, a majority of the court has not applied that same test to forensic laboratory findings.[14] This court's opinion in *Young* correctly refers to the so-called "primary evidentiary purpose test" in the context of forensic laboratory findings as "the basic 'evidentiary purpose' test espoused by Justice Kagan" in her opinion for the dissenting Justices in *Williams, Young,* 63 A.3d at 1043, but appropriately did not suggest that this test represents "Supreme Court precedent before *Williams.*"

The Supreme Court came close to applying the "primary evidentiary purpose test" in *Melendez–Diaz* when it held that the certificates of analysis at issue in the case "required the analysts to testify in person" because the certificates were "prepared specifically for use at petitioner's trial," were "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact,' " and under Massachusetts law had "the sole purpose ... to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." 557 U.S. at 309, 310, 311, 324, 129 S.Ct. 2527. But, to repeat, Justice Thomas, the fifth member of the *Melendez–Diaz* majority, wrote separately to state that he joined the Court's opinion only "because the documents at issue in this case are quite plainly affidavits, ... [and][a]s such,

13. There, we relied on alternative criteria for determining whether a statement is testimonial that would be accepted by the four *Williams* dissenters plus Justice Thomas or by the four *Williams* dissenters plus the *Williams* plurality, alternative tests that were "all we need to say about *Williams* ... for purposes of deciding the present case." *Young,* 63 A.3d at 1044.

14. As Justice Kagan observed in her dissenting opinion in *Williams,* "no proposed limitation commands the support of a majority" of the Supreme Court. 132 S.Ct. at 2277 (Kagan, J., dissenting); *see also id.* at 2261 (Thomas, J., concurring in the judgment) (opining that declarant's primary intent "to establish some fact with the understanding that his statement may be used in a criminal prosecution" is a necessary but not sufficient criterion for deeming a statement to be testimonial).

they fall within the core class of testimonial statements governed by the Confrontation Clause." *Id.* at 330, 129 S.Ct. 2527 (Thomas, J., concurring) (citation and internal quotation marks omitted).[15] As this court found "notable" in *Little v. United States,* 989 A.2d 1096, 1105 n. 12 (D.C. 2010), "Justice Thomas's narrow concurring opinion expressly signed onto the majority opinion only with respect to 'certificates of analysis,' 'the documents at issue in this case.'" *Id.; see also, e.g., Nardi v. Pepe,* 662 F.3d 107, 111 (1st Cir.2011) (noting that Justice Thomas, "a necessary fifth vote for the majority[,] limited his support to 'formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'").

This situation has led one court to observe, insightfully, that "[w]hile on its face the [*Melendez–Diaz*] opinion could be dubbed a 'majority' opinion, we refer to it as a plurality opinion because the language of Justice Thomas's concurrence makes clear that his assent to the opinion was not a blanket endorsement of its entire rationale." *People v. Davis,* 199 Cal.App.4th 1254, 132 Cal.Rptr.3d 472, 479 n. 6 (2011). Particularly apropos of my colleagues' reasoning here, another court has observed:

"When applying the *Marks* rule, we look for 'a legal standard which, when applied, will necessarily produce results

with which a majority of [the Justices] from that case would agree.'" *Dickens v. Brewer,* 631 F.3d 1139, 1145 (9th Cir. 2011).... Therefore, in *Melendez–Diaz,* Justice Thomas' limitation in his concurrence to "extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," provides the narrow holding of that case with regard to the type of extrajudicial statements that implicate the Confrontation Clause.

*Benjamin v. Harrington,* No. CV 11–2899–JVS, 2012 WL 3248256, at *8–9, 2012 U.S. Dist. LEXIS 113911, at *23 (C.D.Cal. June 27, 2012) (citations and other internal quotation marks omitted); *accord Derr,* 434 Md. at 118, 73 A.3d 254 ("[A]pplying the narrowest holding in *Williams,* forensic evidence must be at least formalized to be testimonial. Because we determine that none of the challenged forensic test results are sufficiently formalized within the meaning of the plurality and Justice Thomas's concurring opinions, we further conclude that none are testimonial.")[16]; *People v. Brown,* 2013 WL 1629430, at *4, 2013 Mich.App. LEXIS 688, at *11 (Mich. Ct.App. Apr. 16, 2013) ("Consistent with Justice Thomas's analysis, we conclude that Bode's DNA report was not testimonial within the meaning of the Confrontation

**15.** Similarly, in *Bullcoming,* 131 S.Ct. at 2717, while the Court held in (what was in large part) a 5–4 decision that a "certificate" that set out the results of a forensic laboratory analysis report and that was "created solely for an evidentiary purpose," was testimonial, Justice Thomas declined to join in the portion of the opinion (footnote 6) that implies that the dispositive inquiry in determining whether a statement is "testimonial" is whether it had a "'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *See id.* at 2709, 2714, 2714 n. 6.

**16.** In *Derr,* the Court of Appeals of Maryland noted that "one legal scholar, Stanford Law School Professor Jeffrey L. Fisher, has concluded that Justice Thomas's concurring opinion, which focuses on the need for a statement to be formalized to be testimonial is 'the narrowest in terms of assessing whether forensic reports are testimonial' and 'will control future cases involving forensic evidence[,]'" citing Jeffrey Fisher, The Holdings and *Implications of Williams v. Illinois,* SCOTUSblog (June 20, 2012, 2:20 PM), http://www.scotusblog.com/2012/06/the-holdings-andimplications-of-williams-v-illinois/. *Id.* at 116 n. 16, 73 A.3d 254.

Clause because it lacked the requisite formality and solemnity."). Similarly, the court in *People v. Davis* said that it would "give effect to Justice Thomas's act of joining the [*Melendez–Diaz* ] opinion and the language of his separate concurrence by treating the analytical consistency between the opinion and Justice Thomas's separate concurrence as the controlling precedent." 132 Cal.Rptr.3d at 479 n. 6.

I agree with the courts quoted above that the *Marks* principle dictates that the common denominator (what *People v. Davis* termed the "analytical consistency") between the *Melendez–Diaz* "majority" opinion and Justice Thomas's separate concurrence represents the controlling Supreme Court precedent—meaning that what my colleagues in the majority refer to as "Supreme Court precedent before *Williams* " amounts to a rule that (outside the context of police interrogation) only formalized materials, such as affidavits, certificates, and prior testimony, are testimonial.[17]

Stated differently, to rely solely on "Supreme Court precedent before *Williams* "

would be to conclude that none of the DNA testimony at issue in this case relayed testimonial hearsay, because nothing in the record indicates that any of the laboratory reports presented through Dr. Baechtel's testimony were in the form of affidavits, certifications, or similar formalized statements.[18] I do not argue, however, that this is the approach we should take in analyzing this case, because, of course, as a Division we are bound not only by Supreme Court precedent but also by this court's precedents, which have filled in some of the gaps left by the Supreme Court's having to date "not squarely addressed" the question, "How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians?" *Williams,* 132 S.Ct. at 2244–45 (Breyer, J., concurring). *Young* in particular established an "intermediate" rule that "an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." 63 A.3d at 1043, 1044.[19] I

---

**17.** *Cf. Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) ("As Justice O'Connor supplied the fifth vote in *Caldwell,* and concurred on grounds narrower than those put forth by the plurality [whose opinion she joined], her position is controlling.").

Notably, the *Williams* plurality, too, recognized the importance of Justice Thomas's formality test, observing that

The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. In all but one of the post-*Crawford* cases in which a Confrontation Clause violation has been found [a police interro-

gation case], both of these characteristics were present.

132 S. Ct. at 2242. I would say that this amounts to recognition of a "special synergistic effect of the two attributes." *Ante,* 189 n. 17 (quoting *Rappa v. New Castle Cnty.,* 18 F.3d 1043, 1060 n. 24 (3d Cir.1994)).

**18.** Accordingly, I cannot agree with my colleagues that "[u]nder pre-*Williams* case law[,] [all of] the hearsay that Dr. Baechtel relayed . . . was testimonial" by virtue of the fact that "[t]he serology and DNA testing was conducted for the primary purpose of establishing some fact relevant to a later criminal prosecution." *Ante,* 191.

**19.** *Young* relied on the observation that:

If the [*Williams* ] four-Justice plurality would deem a statement testimonial under the targeted accusation test, the four dissenting Justices surely would deem it testi-

turn next to a discussion of our other relevant precedents.

*4. This court's precedents harmonize with, and thus do not require us to turn a blind eye to, the guidance derived from the plurality and Thomas opinions in Williams.*

My colleagues in the majority conclude that the opinions in *Williams* do not "affect[ ] our rule in *Roberts v. United States,* 916 A.2d 922, 938 (D.C.2007), that there is no 'dispute' that the conclusions of FBI laboratory scientists—the serologist, the PCR/STR technician, and the examiner—admitted as substantive evidence at trial are 'testimonial' under *Crawford.*" *Ante,* 180. I disagree with both the premise and the conclusion.

The first point I would make is that my colleagues' summary of the holding of *Roberts (ante,* 182–83) is somewhat misleading. We decided *Roberts* (and made the statement that my colleagues quote) in reliance on *Thomas,* observing that *Thomas* left "no room for dispute," that the conclusions of the laboratory analysts admitted as substantive evidence were testimonial, since the analysts were " 'tasked' . . . to perform tests providing the basis for 'critical expert witness testimony . . . *against appellant at his criminal trial.*' " *Roberts,* 916 A.2d at 938 (quoting *Thomas,* 914 A.2d at 13) (italics added); *see also Thomas,* 914 A.2d at 14 ("[B]ecause DEA chemist's reports are created expressly for use in criminal prosecutions as a substitute for live testimony *against the accused,* such

reports are testimonial." (italics added)). The other factor we highlighted in *Thomas* (in concluding that the Drug Enforcement Administration chemist's report was testimonial) was that "[i]n form and content, the [laboratory analyst's] report was a formal and solemn 'attestation' " "designed to serve as . . . testimony."[20] *Thomas,* 914 A.2d at 12–13. Thus, the factors we found dispositive in *Thomas* and *Roberts* are the very factors that the five Justices view as determinative of whether a forensic laboratory report is testimonial. I therefore cannot agree with my colleagues that "our own case law has established the principle that statements of DNA findings and analysis are testimonial if they are made primarily with an evidentiary purpose, regardless of their formality or any other particular criteria." *Ante,* 184.

My second basis for disagreeing with my colleagues is that *M.A.P. v. Ryan* does not "oblige[ ] us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions." *Frendak v. United States,* 408 A.2d 364, 379 n. 27 (D.C. 1979); *see also Washington v. Guest Servs., Inc.,* 718 A.2d 1071, 1075 (D.C.1998) (same) (quoting *Frendak* ); *District of Columbia v. Beretta U.S.A. Corp.,* 940 A.2d 163, 179 (D.C.2008) (recognizing that where the law "simply has not stood still" and "when intervening constitutional rulings necessitate a change in prior law, a division of this court is empowered to recognize that earlier decisions no longer

---

monial under the broader evidentiary purpose test. Similarly, if Justice Thomas would deem a statement testimonial employing his formality criterion along with the evidentiary purpose test, the four dissenting Justices necessarily would deem it testimonial using the evidentiary purpose test alone.
*Id.* at 1043.

**20.** *Accord Tabaka v. District of Columbia,* 976 A.2d 173, 175–76 (D.C.2009) (holding that a clerk's *certificate attesting* to the fact that the clerk had searched for a particular relevant record and failed to find it, was inadmissible over objection without corresponding testimony by the DMV official who had performed the search) (italics added).

have force" (quoting *Kleinbart v. United States,* 604 A.2d 861, 870 (D.C.1992)) (alterations and internal quotation marks omitted)).

Third, in my view, the plurality and concurring-in-the-judgment opinions in *Williams* give us a weighty reason to limit our opinion in *Roberts* as well as our opinions in *Gardner* and other relevant cases to their facts—a course we have sometimes taken when, in a prior case, our court was not presented with facts that subsequent case law developments suggest may be significant. *See, e.g., Robinson v. Washington Internal Med. Assocs., P.C.,* 647 A.2d 1140, 1145, 1145 n. 2 (D.C.1994). Attention to the facts of these prior cases reveals that their holdings square quite comfortably with the rule derived from the plurality and Thomas opinions in *Williams.*

In *Roberts,* after complainant K.W. reported that defendant Roberts had forced her to have sexual intercourse with him, FBI analysts compared DNA extracted from semen found in K.W.'s panties to the known DNA profile of appellant and found a match. 916 A.2d at 925. Thus, a primary purpose of the laboratory analysis (the results of which were relayed at trial by a substitute for the original DNA examiner) was to provide evidence "against appellant at his criminal trial." *Id.* at 938. In *Gardner,* the laboratory analysis to which the testifying experts referred at trial was performed after the defendant became a suspect in the shooting of a cab driver; the analysis found a DNA match between profiles developed from blood found on the defendant's jacket and the victim's blood. 999 A.2d at 57. *Veney v. United States,* 936 A.2d 811 (D.C.2007), too, was a first-degree sexual abuse case in which the defendant became a suspect

based on the victim's identification of him as the perpetrator. Thus, the laboratory analysis was ordered with a primary purpose of providing evidence against appellant at his criminal trial. *See id.* at 816. We simply "[a]ssum[ed] a confrontation clause violation." *Id.* at 831. Similarly, in *Kaliku,* witnesses identified the defendants as the perpetrators of a sexual assault, and DNA testing was performed thereafter. 994 A.2d at 773–74. This court assumed without deciding that admission of the DNA expert's testimony violated the Confrontation Clause. *Id.* at 776, 777.

Thus, limited to their facts, none of our precedents compels us to treat as testimonial hearsay a DNA expert's testimony that relays non-solemnized laboratory findings reported before the defendant became a suspect.[21]

5. *The facts of this case furnish an additional compelling reason for declining to apply the Confrontation Clause with "wooden formalism."*

There is an additional reason why we should resolve this case by applying the analysis this dissenting opinion advocates, rather than by applying Confrontation Clause rules "unleavened by principles tending to make [the] rules more sensible" or "applying wooden formalism" that results in "bar[ring] reliable [DNA] testimony offered by the prosecution." *Bullcoming,* 131 S.Ct. at 2727 (Kennedy, J., dissenting). It is that "the defendant in this case was already protected by checks on potential prosecutorial abuse such as free retesting for defendants." *Id.* That is, the record shows that the crime-scene evidence in this case was made available for testing or re-testing by appellant's de-

---

21. *Cf. Williams,* 132 S.Ct. at 2242 n. 13 ("Th[e]se decisions ... are to be deemed binding precedents, but they can and should be distinguished on the facts here.").

fense team. I believe we can say with assurance that if appellant's independent testing had provided him with a basis for any genuine doubt about the accuracy and reliability of the forensic laboratory analyses in this case, he would have been able to demonstrate the reasons therefor through cross-examination of Dr. Baechtel or through presentation of his own DNA expert.[22]

I recognize that an almost knee-jerk reaction to this point will be a protest that it amounts to shifting the burden of proof away from the government (where it must always remain) to the defense, but that protest would be misplaced. There can be no doubt that the government bore its burden of proof in his case. The point I have attempted to make is that this court should not be resistant to a test for whether DNA testimony relays testimonial hearsay that *both* reflects the views of five Justices of the Supreme Court that testimony such as that in issue here was not testimonial *and* that sensibly avoids reversal of a murder conviction when the availability of independent testing by the defense leaves us with no reason to doubt that the DNA expert's testimony was reliable.[23] In this circumstance, "requiring the [government] to call the technician who filled out a form and recorded the results of a test is a hollow formality." *Id.* at 2724 (Kennedy, J., dissenting). We ought

not to resolve "the difficult general question ... as to how, after *Crawford,* Confrontation Clause 'testimonial statement' requirements apply to crime laboratory reports" by resorting to hollow formalities. *Williams,* 132 S.Ct. at 2248 (Breyer, J., concurring). Nor should we ignore the Justices' more refined views in *Williams* by invoking broad pronouncements which were not joined by all the justices who formed the majority in fractured 5–4 decisions, and whose application "could undermine, not fortify, the accuracy of factfinding at a criminal trial." *Id.* at 2251 (Breyer, J., concurring).

**B.  In the alternative, we should hold that appellant waived his confrontation rights in this case when, to his own advantage, he elicited from Dr. Baechtel testimony relaying laboratory analysts' findings.**

There is yet another reason why reversal is not warranted in this case. A defendant can waive his confrontation rights by strategically using the objectionable evidence "to bolster his theory of the case." *United States v. Cooper,* 243 F.3d 411, 416 (7th Cir.2001). A substantial argument can be made that this is precisely what happened here, notwithstanding the defense's vigorous pre-trial objections that Dr. Baechtel lacked the "personal knowledge" to testify about the details, accuracy,

---

**22.** *Cf. Roberts,* 916 A.2d at 940 ("[A]ppellant could have subpoenaed and cross-examined [the laboratory analysts] if he doubted [their] findings, qualifications, or methodology ... but he did not. Nor, as mentioned earlier, did he call his own experts to dispute Dr. Baechtel's conclusions ....") (internal quotation marks omitted).

**23.** I do not, as my colleagues imply, argue for an "available to the accused" *exemption* from the demands of the "Confrontation Clause." *Ante,* 191. Nor do I ignore that appellant's rights under the Confrontation Clause are

"fundamental," *ante* 180, or dispute that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." My point is that the views of the five Justices give us a sound reason to conclude that the critical testimony here (that Dolinger's blood was on the gray shirt and that the blood DNA of only a single unknown individual was found at the crime scene) *was not testimonial, and thus that it did not implicate appellant's Confrontation Clause (including cross-examination) rights.*

and reliability of the work performed and the results reported by the laboratory analysts.

During trial, appellant's defense team did not stand on the objections the defense had raised earlier about Dr. Baechtel's inability to "say whether the biologists did ... what the biologist[ ] was supposed to do," about Dr. Baechtel's lack of "personal knowledge" about whether laboratory analysts did certain testing and about matters such as whether a stain was a bloodstain and whether it came from a particular evidence sample, and about the possibility that analysts "manipulate[d] the data." Nor was defense counsel's cross-examination of Dr. Baechtel limited to asking questions to establish that he could not say from personal knowledge whether or how the laboratory analysts performed various tasks.[24] Rather, defense counsel posed questions to Dr. Baechtel that invited him to vouch for what the serologists and biologists did or did not do. Defense counsel also elicited from Dr. Baechtel hearsay testimony about laboratory findings that counsel then asked the jury to accept to his advantage.

For example: Defense counsel elicited Dr. Baechtel's agreement that he "definitively kn[e]w that someone else's DNA is in the wearer areas of" the gray shirt, and then told the jury in closing argument that "DNA inconsistent with Mr. Jenkins and Mr. Dolinger on the wearer area" showed that someone else was connected to the shirt. Counsel also elicited Dr. Baechtel's agreement that no blood was on the screwdriver ("So what's there is not blood, correct?"), and that laboratory staff "didn't take the screwdriver apart to see if there was any blood ... that ... seeped down the shaft ... where the handle is" and also made no attempt to get skin-cell DNA from the screwdriver. In addition, counsel elicited testimony from Dr. Baechtel that the laboratory analysts made no effort to obtain wearer DNA from the straps of the backpack and that no blood was found on the black backpack despite diligent efforts to find any that might be there ("you [i.e., the laboratory analysts] tried as hard as— as you could to see if there was any blood on the backpack, correct?"). Counsel thereafter drew jurors' attention to the fact that no blood was found on the backpack and asked the jury whether it made sense that appellant carried the backpack everywhere, as the government claimed, without leaving any blood.

Further, counsel elicited from Dr. Baechtel testimony that no effort was made by the laboratory analysts to get skin-cell DNA from a shirt that was found under Dolinger's body; that "no serological work was done" on the collar and cuff of the gray shirt and thus that there were "no negative serological results" as to those areas; that no attempt had been made to see how much DNA was present in presumed-blood samples taken from the floor

24. Through such questioning on cross-examination, appellant could have "actually benefited from the absence of [the laboratory analysts] ... by showing that [Dr. Baechtel] could not be sure there were no flaws in [their] work without establishing that there were any actual flaws." *Commonwealth v. Barbosa*, 457 Mass. 773, 933 N.E.2d 93, 111 (2010). Instead, as I describe in the text that follows, while purporting to object to Dr. Baechtel's testimony that was not based on personal knowledge about what the laboratory analysts did and found, appellant elicited Dr. Baechtel's testimony about all manner of details of the laboratory analysts' work and invited the jury to rely on Dr. Baechtel's answers that were helpful to the defense. To reverse appellant's conviction now because of Dr. Baechtel's testimony would be to "promote trial and appellate gamesmanship." *People v. Fackelman*, 489 Mich. 515, 802 N.W.2d 552, 573 (2011) (Young, C.J., dissenting).

in Dolinger's house and from a wall area going from the first to second floor; that "there were a number of items of evidence in this case that FBI Serology had determined were blood" that were never subjected to DNA analysis; and that there was a large number of other items, too, from which the analysts "did not attempt to get DNA results." Counsel relied on Dr. Baechtel's testimony that much of the physical evidence from the crime scene was never tested by the laboratory analysts to elicit his agreement that "the killer's blood could be one of those blood stains" that his unit "did not attempt to get DNA profiles from." And, referring to such testimony in closing argument, the defense reminded the jury that "Dr. Baechtel told you" that "they didn't do DNA testing on much of the blood in the house."

Additionally, defense counsel elicited Dr. Baechtel's agreement that the DNA technicians "didn't attempt amplification" of the DNA recovered from sample Q–32, a swab from the bathroom sink; that the collar and left cuff of the gray shirt were "eyeballed and no blood was observed with the eyes"; that the analysts "didn't check all the wearer areas of the sweatshirt" and "didn't swab the zipper." Defense counsel also elicited Dr. Baechtel's statement that while Dolinger's blood was found on a Swiss army knife found in the basement, nothing connected appellant to the knife.

This court has previously recognized that where the government improperly elicits evidence but the defense "turn[s] the violation to its own advantage," the defendant cannot on appeal "be heard to complain of the prejudice [the evidence] allegedly caused." *Mack v. United States*, 570 A.2d 777, 778 n. 1 (D.C.1990).[25] This rule applies here because, as described above, although complaining on appeal of Dr. Baechtel's lack of personal knowledge about what tests the laboratory analysts performed and what they observed, the defense, in very deliberate fashion, used Dr. Baechtel to establish, to appellant's advantage, facts about what the analysts did (or omitted) and found (or failed to find). In my view, if we do not resolve this appeal on the basis of the analysis I advocate in section 1 above, we should hold that by affirmatively relying on Dr. Baechtel's knowledge about what the non-testifying analysts did and did not do and on the accuracy of their test results, appellant forfeited or strategically waived his Confrontation Clause claim with respect to Dr. Baechtel's testimony that relayed the analysts' statements.

For all the foregoing reasons, I respectfully dissent.

---

25. *See also United States v. Silvers*, 374 F.2d 828, 831–32 (7th Cir.1967) (holding that a defendant's attempt to use an "erroneously admitted line of evidence" to build his defense at trial "cures or waives the error"); *Sevener v. Northwest Tractor & Equip. Corp.*, 41 Wash.2d 1, 247 P.2d 237, 245 (1952) ("While a party does not waive his objection to the admission of incompetent evidence by subsequently introducing evidence in self-defense to explain or rebut the incompetent evidence, he may by subsequently using it for his own purposes, or by introducing evidence similar to that already objected to, waive his objection."); *see generally* 1 Kenneth S. Broun et al., McCormick on Evidence, § 55 (6th ed. 2006) ("The offering of like evidence by the Objector.").